Good morning, ladies and gentlemen. For the record, I will note that Judge Rovner is participating in this argument by video, so you'll see the lawyer's arguing. We'll see her on the screen, and the rest of you will hear her. So, we're ready for you, Mr. Brindley. May I please the court? My name is Beau Brindley, and I represent the defendant's appellant, Nikolai Tantchev and Bakhmagna Chogson. Mr. Tantchev appeals from several decisions made at the district court level, and I would like to begin with the issuance of the deliberate avoidance, or so-called ostrich, instruction. Over time, this court has established some rather stringent requirements for when it is appropriate to give the deliberate avoidance instruction. There was evidence of deliberate avoidance by Mr. Tantchev, was there not? I mean, I take it, for example, that he made himself absent when the containers were loaded. He did not look inside the containers prior to shipping, because he did not want to have any liability for the contents. And even in the absence of any so-called red flag, given concerns about safety and the possibility of contraband, doesn't his intentional ignorance as to what was inside the containers, doesn't that alone support the giving of the ostrich instruction? The problem, Judge Rovner, and I'm glad I can see you there, the problem with that logic in this case is simply that we heard evidence from witnesses who did multiple legitimate shipments of cars with Mr. Tantchev. And it was his practice in all instances, not just with these stolen vehicles, it was his practice in all instances to have the people load the containers themselves after hours. No one said this was a difference. The people who talked about having done multiple legitimate loads of vehicles and other items all said that he did it the same way. And this Court has made clear that what you're looking for in the deliberate avoidance situation are instances in which a defendant deviates from his normal practice. What did he do? I mean, all his duty did was just get a container there and he ignored it from then on? He provided, well no, he provided the container. The container was at his shipping yard. And then the individuals doing the shipments provided him with details, which he would then reflect in written paperwork that he would turn over to the person who's picking up the container at Atlantic Express. So can I just pause there for a moment because I thought that was an important detail. If you think of the normal formalities of international shipments of goods, or actually for that matter even domestic shipments, he would have to indicate on some sort of bill of lading or receipt or whatever he was using what was inside the container and he would sign it, right? He did. He got that information provided to him by the shippers, the people that were doing the shipping. All of them testified to having done that the same way in legitimate shipments as with these shipments. And they provided the information which he then reflected in the paperwork as it was given to him, but he did not go into the container afterwards to confirm whether or not their statements were true. This would be a problem if... And the government also pointed to evidence contrary to his testimony that he filled out the shipping paperwork. I'm not sure that his testimony was contrary to having filled out the shipping paperwork. I think he talked about having filled out the paperwork and emailed it to Atlantic Express or provided it to them, but with respect to the question of whether or not there's a safety issue or there's a duty. The problem there is that if across the board his practice was to be reckless about that duty, and everybody seemed to suggest that it was, that's what he always did. And if that's what he always did, then this isn't an ostrich situation. This court has made clear that it has to be a difference. There has to be some kind of difference. There are no articulable red flags about these shipments making them different from the legitimate ones. And ultimately, when the argument is made that he would obviously need to be concerned about safety and so should have done better in terms of looking in there and verifying, what we're really getting at is a binary choice. That's really saying, well, he did look in there. That's the truth. That was what the government's argument has always been. And this safety thing suggests that Mr. Tangier, he really did look in there and he really did know. And the problem with that is this court has said when it's a binary choice between actual knowledge and not guilty, then the ostrich is inappropriate. But you are, I mean, just to listen to you today even, there is the possibility that he's taking a see no evil, hear no evil approach to this and assuming some pretty considerable liability along the way, as you say, you know, just recklessness because the person who signs that bill of lading or what have you is responsible. He's warning what's in there. That may be. But it's, Your Honor, it's my view based on the body of case law and the issue of the ostrich here that simply having a across the board practice that doesn't deviate from legitimate versus illegitimate, you can have a reckless or negligent business practice all the time and you don't get the ostrich instruction against you. If you're a doctor, for example, and you never take vital signs and yet for both your people that are getting bad prescriptions and people that are getting legitimate prescriptions, that wouldn't be an ostrich situation. You would just be a negligent doctor. Actually, look, given his own testimony, that notwithstanding his responsibility and liability for the shipments as the nominal shipper, given his testimony that he didn't want to know what his customers loaded into the containers, so he makes himself absent during the loading. Surely it's a permissible inference that he knew there was a possibility that contraband was being loaded into those containers and that his knowledge of such contraband would inculpate him. And that is a perfect ground, it seems to me, for the ostrich instruction. So what if it was the real thing? I mean, I'm not even sure why that matters. Well, because – I'm sorry, I don't mean to – I'm sorry, Judge, did I interrupt you? Okay, I think it matters because in this situation, we don't want to be giving the ostrich instruction and bringing the negligence idea into a criminal case in every instance in which someone's just negligent all the time in the way that they do their business. What he said in his testimony was he didn't want to go in there after they had – because they did their own securing. They tied the things down themselves, and it was his view then, and some of the witnesses admitted, yes, well, I was responsible for how it was tied down. I didn't expect him to go in there and do anything to it. And so as a result of that, I think what you would have is a negligent business practice across the board, and that should not be grounds for the ostrich. Well, I mean, even if you're right about that, I mean, isn't the question before us a little more subtle, which is that the district court uses essentially the pattern instruction for the ostrich situation, and it roughly follows things like the global tech case. The person subjectively believes that there's a high probability that the fact exists, namely that these things are stolen, and takes deliberate actions to avoid learning of that. The question, isn't it really could a jury find that even though suppose you're right? I mean, I think you probably are right. A jury wouldn't have had to find that on this evidence, but I think what we need to focus on is could a jury find that on this evidence. That he thought there was a high probability based on this evidence about those particular shipments? Yeah, well, about these particular shipments that he's shipping cars in particular that are stolen. That's the charge. That's the crux of it, yes. Yeah, that's the statute. And Judge, the answer is the jury could not find that unless there was some kind of evidence suggesting that there was some way that he didn't actually know, but yet he had some reason to believe it about these shipments. And there was nothing. That's the problem for the government. They identified no red flags because there was nothing different about these shipments. And by the way, can I just quickly clarify this appeal? This appeal seems to me to be solely on the, well, I guess you have something to say about structure, but we've got the three different convictions. We've got the cars, we've got the structure, and we've got, so, but I don't see you saying much about some of the other theories. Judge, with respect to the ostrich, we are talking about the cars. Right, the ostrich is just the cars. That's what it addresses. With respect to, there is an argument. But we also have the false statement that Mr. Tantchev made. Chogson, that's separate. No, but I'm looking at the judgment. You're not complaining about the false statement conviction for Mr. Tantchev. I don't think Mr. Tantchev was convicted of a false statement. I'm looking at the judgment. It says 18 U.S.C., false statement to federal officer, offense ended. I think. Count 2-4. I think that would be referring to Mr. Chogson only. No, it's not. Mr. Chogson is count 6, and this is counts 2 and 4. 1001A3. I'm just, maybe there's something wrong with this judgment. I don't remember arguing about that at the trial. But this says he's found guilty on all these counts, in counts 2 and 4, as the government, I guess. Yes, I think that, at least on this point, the government and I will agree. Well, at least on this point, did he know there were cars being shipped? Yes, in these instances and in others, yes. And he knew these were going to Mongolia. Yes, and he shipped cars to Mongolia on many other occasions. Well, see, that's what seems strange to me, that he's doing that all the time, shipping cars to Mongolia. Because he has a large Mongolian clientele, and people that work with him are largely Mongolian. There's a whole Mongolian community, if you go back to the evidence from the witnesses, they often used Mr. Tantchev because they knew him, and there's a reason. There was testimony about how, when you ship the cars to Mongolia. No reasons why, maybe. Well, no, but not a nefarious one. They indicated that there was a reason in terms of the shipping and how much more money you could make when you were selling them in Mongolia for various models. There's evidence on that. So it's only the shipper that knew they were stolen. The person who provided the car would know, yeah. And that's the thing. There's no evidence in this record that Mr. Tantchev had any reason to know anything from those people to suggest there was something wrong. It would have to be totally postulated hypothetically with no supporting evidence, and that's why I believe the ostrich is openly not appropriate in this case. To get to the ostrich, everybody basically, because there is no deliberate act, everybody, including the district court, talks about this suspension of curiosity, which this court has been very harsh on in recent decisions in the Macias case, for example. The idea that, well, if you don't ask enough questions or you don't do more. The court in Macias was pretty clearly critical of that in saying there must be an act, and I noted that it was put in italics by the court. There is no act here. That's why in this instance I think the ostrich is a mistake, and that goes definitively to those car charges. I want to turn now to Mr. Chogsom's false statement conviction for a minute. Mr. Chogsom was asked a question and shown a photograph. Who is this person by federal agents? The name that he gave was a proper name that everyone agrees that person had used, although an alias name. That person had more than one name. The agents did not ask a follow-up question about whether he was related to that person or whether that person went by any other names. But doesn't he go on to say that there's this sister and that she's off in Mongolia? He adds additional facts. Which are also all true. But he implies these are two different people. Well, that's the problem, Judge. The case law on this is clear. If it's a literally true statement, his intent or implication. I think it's more than that. And we also have to look at what is charged. What is charged is only the one statement. Who is this person? Isn't it important, Mr. Brindley, that Mr. Chogsom not only identify the person in the photograph as Jamay Lee, but also remain silent as to her true name? And, Judge, it is absolutely his right to do that. You do not. The case law is clear, and I cited it. You do not have to add things. I haven't finished my question. I'm sorry. Go ahead. But he also remains silent as to her true name, even after the agent specifically asked him about his sister. And they did not ask if it was the same person. The only issue before us is whether that answer was literally true. Not what his intention was. I think you were saying that the agent already knew from somebody else that that was his sister. I don't know whether he did or not, but he didn't follow up. I'm talking about the agent. I'm not sure what the agent knew. Well, you don't know that. Well, we have evidence in the record that Agent Gibson finds the nephew who tells Agent Gibson that the woman in the picture is Burma Chogsom, and then Gibson goes to interview Chogsom. And this is the part that concerns me about your theory. Chogsom says it's Jianmei Li who used to work for him at a trucking company and asked him to accept the mail. Then Gibson says, Do you have a sister named Burma? He says, Yes, but she's back in Mongolia. He's telling the agent that there's a different person, that there is a different person and that Jianmei Li and Burma are different people. Two things, Judge. We only deal with the charged statement, which is the proper name, and then it's charged the rest. But secondly, all of those statements are literally true. Burma Chogsom was in Mongolia. Jianmei Li did work at that company under the name Jianmei Li. When it's a proper noun in this situation, the problem is that if you don't ask any follow-up, the defendant can give a disingenuous but narrow response. And this Court has said disingenuous, narrow response. And can I factor in the fact that in his testimony, Mr. Chogsom says he recognized that the person in the photograph was his sister Burma, but he didn't say so because he wanted to avoid immigration problems. That certainly suggests that his misleading and false answer to Agent Gibson was, in fact, knowing and willful rather than pertinent. But, Judge, that's not the issue. We're not talking about whether it was willful. We're not talking about whether it was his intention. His intention could have been to give, and it was, as he stated, I gave a literally true although I knew misleading answer. They didn't ask, so I chose not to give more information. And this Court has said that's okay. It's up to the agents to follow up and ask a question that requires the defendant to give. And they could have. Well, is this Burma Chogsom? Is this the same person? None of that happened. He gave a literally true answer. And I'll finish with the logical syllogism that we put in the brief. If he had said in response to the question, this is Junmai Lee and Burma Chogsom, everyone would have to agree that was true. As a matter of logic, though, if you have a conjunctive proposition like that, A and B, and one of them is false, then when you put the two of them together, it would have to be false as a whole. It's not. And you think about it that way, you know that as a matter of logic, both sides of the ander have to be true, which means this is a literally true statement. We might not like the fact that he had other intentions, but the law is literally true statements, even if disingenuously narrow. That is not a crime. And I'd like to reserve the rest of my time. Certainly. Mr. Hogan. May it please the Court. William Hogan for the United States. Your Honor, with respect to the ostrich instruction, the district court found that based on Mr. Tanchev's defense, because the court had reserved ruling until he had testified in this case, that the government produced sufficient evidence that he deliberately avoided learning the truth, specifically that the government put enough evidence in to show that he cut off his normal curiosity by an effort of will. And the court specifically cited the Pabney case in which the defendant did not ask follow-up questions, and at the time the court decided to give the instruction, specifically cited the Perotti case, where this court again held that the defendant did not follow up and ask additional questions that were necessary and that that was sufficient for deliberate avoidance. Did you say normal curiosity? I thought in your brief on this issue, you seem to rely on evidence supporting an inference of actual knowledge on the part of Mr. Tanchev. And that sort of evidence does not support the giving of an ostrich instruction. In this case, Your Honor. It's evidence that he may in fact have been ignorant of what was in the containers as he testified he was to support the instruction. So I'm wondering about that dichotomy. I suggest there is no dichotomy here, Your Honor. The government presented evidence of both actual knowledge and of deliberate avoidance. Can you explain to me where the evidence is as to the particular shipments where the stolen cars were inside the container? We all agree he has some shipments that aren't charged, and as far as we know are all legitimate shipments. But I have seen in the ostrich cases that we need some showing of suspicion specific to this transaction. What was it about those that distinguished anything else? For the first shipment, for example, his co-defendant, Mr. Chogsom, owned a Honda Element, and that was supposed to be contained in the shipment. That title, which was obligated to be sent to the CBC in Los Angeles by Mr. Tanchev, was for the Honda Element. There was no Honda Element in the vehicle. Instead, there was a stolen BMW. The day that the shipment was seized, Mr. Chogsom here ran out and got a replacement title for the Honda Element. Mr. Tanchev claimed in his testimony that all three shipments that are at issue here in the convictions in Counts 1, 3, and 5 were the result of provision of automobiles by a person named Jargo Seydin Tudev. Well, that person had nothing to do with the case, had nothing to do with Mr. Tanchev, had never met him. The government located him after he was blamed by the defendants in their opening statement as the culprit or the fall guy in this case. We found him while the trial was ongoing, and we called him in rebuttal. He said that he had nothing to do with these shipments, had never met the defendants, was not in Chicago. He was the only person in all the paperwork associated with the case that the government had been unable to locate in its pretrial investigation. Two weeks before the trial began, we turned over that paperwork, which included a bunch of government database searches for all the Mongolians who were involved and reflected on the shipping documents, and he was the only one that we couldn't account for. That was obvious, and that was the person that they then focused on as the supposed person responsible for providing the shipments in this case. The second ship— Why isn't that—I mean, I'm not sure why that's ostrich proof. I mean, it may be proof that he was lying when he fills out the manifests. Well, he had an obligation to tell the truth when he filled out the manifests. The CBC regulations—in fact, our first witness or second witness in the trial was a CBC officer who put in a copy of the regulations. This is the first exhibit in the case. It's a copy of the government's regulations that reflect that the shipper, who is Mr. Tancher in this case, has a legal obligation to accurately and honestly inform CBC as to what the contents of the shipments are. So Mr. Tancher is the shipper or a freight forwarder of some type? Mr. Tancher is the person who is the shipper in this case. The freight forwarder is the person who the Atlantic Company— It's the Atlantic, okay. —who picks it up and sends it on the rail car to Los Angeles and then on to Mongolia. Right, and they're not the carrier either. They're somebody who's—I mean, there are all these roles. Right, Merck is a carrier. So while you're on it, I'm looking— I just want to clarify the question I raised with Mr. Brindley. I'm looking at the judgment in a criminal case in Mr. Tancher's thing, and this seems to me to say 1001A3, the false statement, counts two and four. That's correct. So he's convicted of that. Yes. He's convicted of the— That's the false paperwork that he said. That's the false paperwork. Yes. We have the structuring conviction counts seven, and we have the three counts— Which is not being challenged in this case. Right, as far as I can tell, yeah. So we've got the structuring. And then we have the three counts, I'm sorry, on 553. Yes, Your Honor. Is that right? Okay, so he—no matter what happens, we're really focusing on these 553 counts here. No, all five of the first counts. Count one is the shipment. Count two is the paperwork with the shipment. Count three is the shipment. Count four is the paperwork with that shipment. Count five is the shipment that was interdicted in China,  so that was not charged as a false statement. I see, that's why it's just two and four on the paperwork. Right. Okay. So the ostrich instruction was given with respect to all five of the first counts, that he deliberately closed his eyes and avoided knowledge. And there is—Mr. Brinley argued, for example, that Mr. Tantchev across the board engaged in this negligent practice. Well, that's just not the case. Mr. Tantchev's business in shipping cars to Mongolia was an ancillary small side of his business. He had run a very large national trucking company employing upwards of 50 people at different times throughout the United States, shipping goods all over the place. His cross-examination made clear that in that capacity, he was primarily concerned about the safety and the security of the contents of the containers that he shipped all over the place. Loading in trucks? Including in trucks. He had a trucking yard and had many employees that trucked goods all over the country. And, in fact, a good part of the testimony was that he would wire money to truckers on the road so that they would have enough money for gas and food and things like that while they were still out and about. And there were several different aspects of his trucking company, in fact, including his testimony, that because of safety concerns and financial concerns, it was paramount that he maintain the security and safety of the goods that are contained in the containers and that he was responsible for that because he knew he had liability for that. And he, in this case, said as distinguished from that. So you're saying the jury could have taken that as evidence that he wasn't quite as indifferent as Mr. Brindley suggested? He wasn't indifferent at all. In fact, he testified unequivocally at great length that his paramount concern was safety. And the district court found this, by the way, that his paramount concern was safety and security of the contents of his containers in his regular business as opposed to this. And, in fact, in the government's brief, there's a question that I asked at the end of his cross-examination. I think it's page 31 in our brief. There's a question that says, how do you distinguish if you're so careful in your regular business from why you maintain such security in those cases? But in this case, you're claiming that you didn't look. And the reason that you're claiming that you didn't look is because you're saying that you wanted to avoid liability. What makes you think that you could avoid liability in these cases as distinguished from your other business? And his answer was, well, I just made that up on my own. And I followed up and I asked him, by the way, did you get any advice from that? And the answer to that is no. I just decided that on my own. And so the questioning in that portion of the cross-examination was, but what about the goods that are inside? You have a responsibility for the goods that are inside, and not just for the goods themselves and the damages, but the liability that could be caused if, for example, an unbalanced container along the lines that you asked, Judge Manning, would fall off a forklift in a trucking yard or as it's being loaded onto a ship or somewhere else. And he acknowledged that the liability would come back down the line to him personally. And then the questioning was, well, he claimed on his cross-examination that he would then try and track down the customers who had ostensibly given him the vehicles to ship. And the question at that point was, but you don't know who they are. These are random people who show up in your yard. You have no paperwork with them. You have no contracts. You have no indemnity agreements. You allow people who essentially come in off the street, according to his testimony, to put vehicles into these containers that you then ship off to Mongolia where you take the responsibility and liability for any kind of damages that could put you out of business. And he said yes to that. Did he ship containers in his trucking business? Yes, all over the country on a daily basis for years. So containers were a typical part of his business? Every day. That was his business, was shipping containers. And you're saying that there was no question that when he was shipping containers by truck that he scrutinized those carefully?  And in this case, Your Honor, the testimony was specifically that, as Mr. Brinley alluded to, he said that there were other witnesses who testified and there was no other testimony by other customers. That's not true either. In this case, two of the three shipments involved a car being loaded in by another Mongolian who went by the name of Soho. It's described in our brief at some length. In both of those cases, that gentleman showed up. The front of the container was already filled. He showed up at 8 o'clock at night after he was a friend of Mr. Chogsom, the co-defendant in this case, and put the second car into the container. There's already one car in there? The container contains two cars. It holds two cars. So the first car is already in there, the stolen vehicle, in both cases. And Mr. Soho shows up. He puts the second car in there, but he doesn't seal the container. So his testimony is that that's the responsibility of the defendants, and that was uncontested at trial. In fact, Mr. Tantchev said, if my customers don't seal the containers, I do it. Well, the only way to seal a container and to even know whether the second car is in there is to open the container and see whether the second car was ever even delivered. He said he never even looked at all. The jury can find that that testimony. You're saying there's no way to seal a container without opening it up again? No, no, I'm not saying that. You can do that, but how would he even know if the second car was in there to know whether to seal a container without looking? Now, that goes to both the deliberate avoidance and to actual knowledge, as Judge Stanton found. So we're assuming that you wouldn't rationally seal a container that was not yet filled up with merchandise, with something. That's right. And Mr. Tantchev, again, was responsible, and Judge Stanton found this as well, for filling out the paperwork, and not only did he fill out the false paperwork with respect to the first shipment by his co-defendant with a Honda in it and blame this Giardo Sagan 2-Dev person who had nothing to do with the case. The second container that we showed had two vehicles in it. Mr. Tantchev's paperwork in that case showed that it had only mining machinery, 44 pieces of mining machinery that he was shipping to Mongolia, weighing, I've forgotten what the weight was. But in that case, there were two stolen vehicles in the car, and the paperwork on that shipment said that it was being shipped in the name of the shipper, the person who was Tantchev's ostensible customer, was somebody named Sarla Jagan Boutron, and its name is in our brief. That person never even got a visa to enter the United States The proof at trial was unequivocal that he had applied for a visa to enter the United States in 2003 and had been denied and had never come into the country at all. Now, with respect to the second charge that Mr. Brinley argued, that is the false statement charge regarding Mr. Chogsum, Chogsum's sister, Burma Chogsum, had entered the United States in 2005, December 2005, under a false and fraudulent Mongolian passport with a forged visa. And she had been arrested by customs at the airport in San Francisco when she came in, held in custody for 10 or 12 months or so, finally bonded out and was scheduled to appear at some point down the road for further deportation proceedings. Came to Chicago, lived with her brother here, the co-defendant. Mr. Chogsum acknowledged that she moved in with him and lived there with him. Eventually went to work in his trucking company because he shared space with Mr. Tantchev at this truck yard in Cicero where they had four or five different trucking companies. In fact, Mr. Tantchev testified that he was so concerned about safety and reliability that he had another company basically on the shelf ready to go in case there was an accident and the liability was so high that it shut down the first company. He'd have another one ready to take its place immediately. Ms. Chogsum, Verma Chogsum, went to work with her brother in that capacity, started her own company, then purchased a false identity. Mr. Brinley says, well, this is just some sort of an American alias. The name Jan Mei Lee is a legitimate Chinese person who got a visa to work legitimately in Guam sometime in the late 1990s. There was an identity theft ring operating in Guam that took a bunch of legitimate Social Security numbers from persons who were authorized to work in clothing factories in Guam. So that's background, but does that mean that when he identifies the sister as Jan Mei Lee that he's not telling the truth? She was assuming that identity for better or for worse. Well, for worse. It was a phony identity that she purchased on the south side of Chicago using a phony Chinese passport in the name of Jan Mei Lee that she used, as far as the evidence in this case is, only to open up a bank account that was then used by Mr. Tantchev to structure money. It may be that if it really was just one of these bank accounts that was used in the structuring part of this that it's not even true that she's really known as Jan Mei Lee. Well, she wasn't known by Jan Mei Lee other than by the defendant and by one of his cousins. Associating with the bank account. Right. And more importantly, Judge St. Eve properly acknowledged in this case that that's a jury question as to whether or not the jury believed Mr. Chogsom as to whether or not he was telling the truth. And she found, specifically in this case, that the jury could easily, is what her post-trial opinion finds in this case, that Chogsom knowingly and willfully made a materially false statement. There was no contest in this case about the materiality. There was no contest about whether it was made to a federal agent or within the aegis of the federal agency. It was only about whether it was false or not. Judge St. Eve found that Chogsom specifically understood Agent Gibson's question, and he was not confused about who Agent Gibson was asking him to identify, in distinction to the Rahman case, which the defendant relied upon in his brief. Yes, Your Honor. Why didn't Agent Gibson ask the next question where he already knew the answer? Well, he wasn't sure of the answer. That was the logic of this. That's why he went to charge. Her agent Gibson had found out that Lee, or Yee, or whatever she's calling herself, was actually, what's her real name? Burma Chogsom. Pardon? Burma Chogsom. Yeah. And he knew that. And why didn't he just ask that question? Well, he did, in a fashion he did. What he did was get an identification card. He got the bank records first for the Jan May Lee account, then he went to the Illinois Secretary of State, got a photograph of the person who had a government ID under that name. He went to the address on that identification card. She wasn't there. He went to another address. He found Chogsom's nephew, who had been living at that address for five years, who told him, yeah, that looks like my Aunt Burma Chogsom, and she's never lived here. And so he then went to talk to Defendant Chogsom, Bhatmagne Chogsom, and at that point he made an appointment. He went to visit Mr. Chogsom, and he showed him the picture and said, do you recognize the person in this picture? And without hesitation, Chogsom said, that's Jan May Lee. She used to work here. She worked in the trucking company with me. She asked me to get mail for her at one point, but she's not here anymore. And then Gibson said, well, do you know Burma Chogsom? And he said, yes, I do. That's my sister. She never worked for me, and she's back in Mongolia. And at that point, Agent Gibson was convinced that there were two separate people. So that delayed his investigation into the financial aspect of this for quite some time. So that she never worked for me is the lie. Saying she's back and so-and-so was the truth. The lie was that that picture was a person by the name of Jan May Lee. That was a false identification. So you're really saying the jury could find that Jan May Lee isn't really an alter ego name, an alias? Well, the jury, as Judge St. Eve found, the jury could legitimately find that Chogsom lied to Agent Gibson for the reason that he gave at trial, which was to avoid immigration problems for his sister, whose legitimate name was Burma Chogsom. That's the reason he gave at trial. He said at trial, under cross-examination, yes, I immediately recognized that that was my sister in the picture. Yes, that was her real name. That's the name that she was given when she was born. That's the name that she lived here in Chicago with me under for a number of years before she went out and acquired this so-called, quote, American identity. Well, the American identity was used to open up an account, the tantra then used to structure $115,000 in six weeks, which he immediately wired out to Bulgaria. All right. If the Court has no further questions, I'll finish. All right. Thank you. I don't see any, so thank you very much. Mr. Brindley. Thank you. To begin with, you go back and look at the evidence. Mr. Tantive's trucking business and his shipping business were totally separate and not the same principles. His trucks were not shipping those same containers. It wasn't the same at all. He had truck drivers that had their own trucks that got their own loads that he would coordinate for them. To try to conflate those two things misses the point on the ostrich. Every argument that counsel made really goes to, well, Tantive did know. That's what every one of those arguments was about, and that goes to that binary problem, actual knowledge or not guilty. That's why the ostrich isn't appropriate. Moreover, with respect to the question of the ostrich, it gets to the only theory here is suspension of curiosity. There was no act. And this Court has criticized that idea and expanding it again here to encompass this I would think is a mistake. I think that is a confusion that the Court has properly identified we shouldn't be dealing with unless there is an act not taken. With respect to Mr. Chogson's answer, a lot of this goes to the fact that maybe there were other parts of the statements he made that they should have charged and were better. They only charged one, the giving of the proper name. But if the jury, your theory is that this really was a legit different name that she used. What if it isn't? What if it's just on the bank account? But there's no evidence that that was the case. All of the evidence in the case, and the agent and no one disputed that she was using this name, going around, getting a bank account, working at a company. She had an ID. She was using the name. So it was a name she was used. If you went in and showed Lois Lane a picture of Superman and said, who is that? And she said, that's Clark Kent. She would be giving a literally true statement. And that, I believe, is the same thing, Your Honor. All right. I think we'll end on that note, Mr. Brindley. Thank you very much. Very well. Thank you. Thanks to both counsel. We'll take the case under advisement.